# CARL RUSSELL STONE v. LUTHERAN DEACONESS HOME AND HOSPITAL.[1]

June 17, 1938.

No. 31,585.

*H. M. Juster* and *Victor M. Petersen,* for appellant.
*Ernest E. Watson* and *Silas S. Larson,* for respondent.

LORING, JUSTICE.

Two cases. These cases come here upon appeal from judgments entered in favor of the defendant following motions for judgments notwithstanding the verdicts rendered in favor of the plaintiff in each action. Damages were sought for personal injuries to the minor plaintiff alleged to have been caused by the negligence of the defendant hospital. The actions were consolidated for trial before the same jury and resulted in a verdict of $3,000 for the minor plaintiff and $2,000 for the father.

[1]Reported in 280 N. W. 178.

On June 18, 1935, Ellen Stone, the wife of Carl Russell Stone, at the defendant's hospital in Minneapolis, gave birth to the child Gary Russell Stone. About five days after his birth the baby developed a rash, and nitrate of silver was applied. By June 27 the rash had improved, and the baby and his mother were discharged from the hospital. After the return home the mother testified that the rash spread and that Dr. Hendrickson, the attending physician, prescribed a treatment which she followed for four or five days, and then, since the blisters got worse, she discharged Dr. Hendrickson and employed Dr. Stewart, who attended the baby thereafter. Dr. Stewart first saw the baby July 6, 1935, at his office. He testified that the baby had a pemphigoid impetigo of the skin distributed over the body and involving the umbilicus. He described this disease as an infection of the skin which in babies commonly makes a blister or bleb. These blisters are vesicles and contain pus, and to the medical profession are commonly known as pustules. He said that all of the blisters he saw on the baby did not contain pus—some of them had been broken. He prescribed silver nitrate. Later on erysipelas developed and spread rapidly. A secondary infection developed in one of the baby's hip joints, and osteomyelitis destroyed the hip joint, with the result that the baby's leg will be about four inches shorter on that side at maturity. Impetigo is a contagious skin disease communicable from contact with a person having that disease or through an intermediary agent, and it is the plaintiff's contention that the disease was communicated to the Stone child from another baby, hereinafter referred to as the Stolpe baby, in the hospital nursery. The Stolpe child was born at the hospital late on June 15, 1935, and consequently was about three days old when the Stone baby was born. The babies were kept in a nursery to which no one but the nurse in charge was admitted, and people who came to see babies saw them through the glass door to the nursery. The nursery had a capacity of about 30 babies and at the time here under consideration had from 15 to 18 babies in it. The babies' bassinets were kept inside a cubicle which was partitioned off from the rest of the nursery by a partition the upper half of which was

constructed of glass. In the alcoves off the end of the nursery farthest from the door were lavatories and sinks where the nurses sterilized their hands and changed their aprons. The hospital entry of the Stolpe baby carries an entry under the date of June 19, 1935: "Skin: rash, pustules on back of neck opened—nitrate of silver applied." On June 20 the entry showed: "Skin: rash—rash opened and treated with alcohol and nitrate of silver—pustules on neck and those in axilla opened and treated with nitrate of silver." On June 21 the entry showed: "Skin: rash—improved—pustules on back of left ear and in left axilla opened and nitrate of silver applied." On June 22 following the entry appeared: "Skin: rash looks better." Under June 24 the entry shows: "Skin: clear—discharged." The record also stated: "Progress Record—June 22, 1935—general condition X-cellent—baby O. K." signed with the initials of the attending physician. The plaintiffs' doctors made no complaint as to the routine prescribed by the hospital for the handling of these babies, but the plaintiffs contend that this routine was broken and disregarded by the nurse attending the children and that she handled the Stolpe baby and then the Stone baby without changing her apron or sterilizing her hands. The evidence in support of this contention is solely that of certain visitors to the hospital who came to see babies in the nursery and who asserted that in looking through the glass panel of the door to the nursery they saw no change of aprons or sterilization take place upon the occasion of their visits to the hospital. It was upon the unsatisfactory character of this evidence that the trial court took the view that there was no proof supporting the contention that proper precautions were not taken. In view of the arrangement of the nursery and the inability of the persons standing at the door to see into the alcoves at the other end of the long nursery, we are inclined to regard the trial court's position as correct; but, all this aside, we think that there is no competent evidence in the case that the Stolpe baby had the disease which subsequently afflicted the Stone baby. Dr. Stewart's opinion, based upon the hospital record and the treatment given the Stolpe child, was that both the Stolpe child and the Stone

child had impetigo, but he admitted that other skin conditions or infections produced pustules and were treated with nitrate of silver or with diluted alcohol. He never saw the Stolpe child, and Dr. Brutsch, who attended the Stolpe child and who initialed its progress record as "general condition X-cellent—baby O. K.," testified positively that the Stolpe child did not have pustules or impetigo, and his testimony was corroborated by the superintendent of the hospital, although she admitted that nurses were not qualified to make a diagnosis. Dr. Brutsch said that the nurse's entry of pustules on the Stolpe baby was incorrect. Upon this point in the case we are compelled to come to the conclusion that Dr. Stewart's opinion is based upon reasoning altogether too speculative in character to justify verdicts for the plaintiffs. Upon their theory of the case, the burden of proof was upon them to establish by a preponderance of the evidence that the Stolpe baby had the disease which was communicated to the Stone baby and likewise by competent evidence that such communication took place. It is conceded that when a child is born its skin is covered with germs which may produce impetigo or other skin infections. There is no contention here that the Stone child was improperly cared for in any other respect than the alleged communication of the disease from the Stolpe child to it. In fact, we think the plaintiffs have wholly failed, primarily because they have not shown competently that the Stolpe baby had the disease which subsequently afflicted the Stone child, and because they have not competently shown negligence on the part of the defendant in the handling of the two babies.

In our opinion, the trial court was abundantly justified in granting judgments notwithstanding the verdicts.

Affirmed.